# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| RIVER VALLEY INGREDIENTS, LLC, et al., | ) <br> ) <br> ) |
| Plaintiff/Counter-Defendants, | ) <br> ) |
| v. | ) **C.A. No. N19C-12-160 PRW** <br> ) **CCLD** |
| AMERICAN PROTEINS, INC., et al., | ) <br> ) |
| Defendants/Counter-Plaintiffs. | ) |

Submitted:  April 7, 2025
Decided:  July 2, 2025
Withdrawn and Reissued with Clarifications: November 5, 2025*

## DECISION AFTER TRIAL

Stephen H. Barrett, Esquire, DLA PIPER LLP, Wilmington, Delaware; Brett Ingerman, Esquire, and Dale K. Cathell, Esquire, DLA PIPER LLP, Baltimore, Maryland; David Horniak, Esquire, DLA PIPER LLP, Washington, District of Columbia, *Attorneys for Plaintiffs/Counter-Defendants River Valley Ingredients, LLC, Tyson Poultry, Inc., and Tyson Farms, Inc.*

Philip A. Rovner, Esquire, and Ryan D. Kingshill, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; J. Allen Maines, Esquire, A. Andre Hendrick, Esquire, Patrick B. Reagin, Esquire, and Matt Covell, Esquire, HOLLAND & KNIGHT LLP, Atlanta, Georgia, *Attorneys for Defendants/Counter-Plaintiffs American Proteins, Inc. n/k/a Crossroads Properties A, Inc., Ampro Products, Inc. n/k/a Crossroads Properties B, Inc., Georgia Feed Products Company, L.L.C. n/k/a Crossroads Properties C, LLC.*

**WALLACE, J.**

Poultry rendering is a brutal business. The rendering process consists of taking the unappetizing remnants of butchered chickens—bone meal, blood, feathers, etc.—grinding them up and dehydrating that material for use in pet food or animal feed.[1] It likely comes as no surprise then, that the competition between the renderers can be just as unsparing.

American Proteins, Inc. ("API") had dominated the poultry rendering market in the Southeast. Tyson Farms, Inc. planned to enter the region and disrupt API's dominance. It made strategic moves to ensure that it would enter the market by either building its own rendering plants or buying out its competition. After Tyson swooped in and contracted with API's suppliers as the expiration of API's contracts neared, API finally agreed to enter into negotiations with Tyson to sell its plants in Alabama and Georgia.

In 2018, Tyson subsidiary, River Valley Ingredients, LLC,[2] and API entered

---

\* On July 2, 2025, the Court issued its Decision After Trial. *River Valley Ingredients, LLC v. Am. Proteins, Inc.*, 2025 WL 1826656, at \*1 (Del. Super. Ct. July 2, 2025). API timely filed a motion for reargument or, in the alternative, to alter or amend the judgment. D.I. 691. By separate simultaneous order, the Court has denied much of that motion. D.I. 702. But the Court has found merit in API's argument regarding the compounding of pre-judgement interest in this instance. Indeed, having considered the parties now-developed arguments on the interest issue, the Court recognizes the value of greater clarity in the Court's findings and holdings, hereby withdraws its July 2, 2025 decision, and issues in substitution this amended Decision After Trial.

[1] 11/18/24 Trial Tr. at 17–19 (D.I. 684).

[2] Plaintiffs are River Valley Ingredients, LLC, Tyson Poultry, Inc., and Tyson Farms, Inc. River Valley is a subsidiary of Tyson Poultry, and Tyson poultry is a subsidiary of Tyson Foods. *See River Valley Ingredients, LLC v. Am. Proteins, Inc.*, 2021 WL 598539, at \*1 (Del. Super. Ct. Feb. 4, 2021). For the sake of convenience and clarity, the Court will use "Tyson" when referring to the plaintiff(s).

into an Asset Purchase Agreement (the "APA"). Tyson acquired API's poultry rendering facilities, the Cummings and Hanceville plants, for $865.8 million. After the deal closed, Tyson noticed issues with the facilities and had lower-than-expected profits.

Due to these issues, Tyson claims that API fraudulently induced them into signing the APA via various false representations and warranties. Specifically, Tyson alleges that API failed to disclose their recent change in process to remove SPN stickwater. Tyson alleges that API also failed to disclose a vital "environmental" report (the "Reid Report). Too, Tyson pleads breach of contract for failure to indemnify for breaches of the APA's representations and warranties. At bottom, Tyson complains that it overpaid because of API's concealment and misrepresentations.

In response, API brings seven counterclaims—fraudulent inducement, tortious interference, unfair competition, recission, indemnification, breach of the Transition Service Agreement (TSA), and civil conspiracy. According to API, Tyson conspired with API's suppliers to illegally coerce API into selling its facilities and force it out of the market. The Court held a seven-day bench trial on the parties' dueling charges of wrongdoing.

# I. THE TRIAL

During the trial, the Court heard the in-person testimony of:

| | |
|---|---|
| Douglas Ramsey | Matthew Bell – Expert |
| Shane Parks | Jon Pesicka – Expert |
| Roy Slaughter | Andrew Dixon |
| Brandon Kyzar | Ave Tucker – Expert |
| Daniel Kaiser | Timothy Hart – Expert |
| Jason Spann | David Meeker – Expert |
| Jeremy Helt | Stephen Gross – Expert |
| Stan Gudenkauf | Michael Hull |
| Richard Stewart | Brian Rindt – Expert |
| Thomas Bagwell | Peter Karutz – Expert |
| Mark Ham | Ave Tucker – Expert |
| Steve Patrick | Timothy Hart – Expert |

The parties presented video deposition testimony from:

| | |
|---|---|
| Joseph Clinton Rivers | Shane Parks |
| Mark Kaminsky | Joseph Rivers |
| Johnathan Green | Douglas Ramsey |
| Rexford Alexander | Scott Peters |
| Bryce Burke | Derek Klemann |
| Mark Rebollit | Jeremy Helt |
| Remi Bagwell | Christell Rooker |
| BJ Bench | Josh McClelland |
| John Reid | Brian Harris |
| Bryan Kattleman | Bo Watson |
| Jacob Swann | Roy Slaughter |
| Charles Starkey | Jeremy Helt |
| Kristin Wolf | Fred Cespedes |
| Betsy Griffin | Jonathan Green |
| Ashley Yayock | Michael Hudlow |
| Roger Smith | |

The parties also submitted over 400 exhibits.

At the close of Tyson's evidence, API made a Rule 41(b) motion regarding

the representations and warranties in Articles 4.5(b), (c) and 4.20(b).[3] The Court granted the motion in part and dismissed the claims regarding Articles 4.5(c) and 4.20(b).[4]

Now, the Court will determine the liability of both parties under their respective claims and counterclaims and appropriate damages, if any.[5]

## II. GENERAL LEGAL PRINCIPLES

The Court has applied the same principles of law in its consideration of the claims and in its deliberations as would a jury. The Court may highlight some of the facts and legal principles most applicable to this particular case. But the fact that some particular point or concept may not be mentioned here shouldn't be read as any indication that the Court did not—during its deliberations—consider all legal principles applicable to this case and to the parties' claims and defenses.

In reaching its verdict, the Court has considered applicable Delaware law and each party's respective arguments, both oral and written, on the merits of their claims and the weight to be accorded to the testimony and evidence. It has examined all exhibits submitted and considered the testimony of all witnesses, both direct and

---

[3]  11/25/24 Trial Tr. at 66–76 (D.I. 686).

[4]  *Id.* at 74–76.

[5]  In addition to the trial evidence and arguments made by counsel, the Court also now has the benefit of the parties' post–trial briefing. D.I. 677, 678, 681, 682.

cross, live and by deposition. As the sole finder of fact, the Court has made its own assessment of each witness's credibility and reconciled, as best it could, any inconsistencies in the testimony and documentary evidence.[6] During trial, the Court applied the Delaware Rules of Evidence to the testimony and exhibits presented. Consistent with the Court's knowledge of those rules and the specific rulings that were articulated both pre-trial and during the trial proceedings, it only used evidence allowed under those rules and rulings for its deliberation.

The Court then reviewed and applied some of the very instructions that it would give a jury in these circumstances.[7]

## III. FINDINGS OF FACT

For certain actions at trial, it is difficult at times to completely segregate findings of fact from conclusions of law.[8] So, to the extent any one of the Court's findings of fact here might be more appropriately viewed as a conclusion of law, that

---

[6]  *Pencader Assoc., LLC v. Synergy Direct Mortg. Inc.*, 2010 WL 2681862, at *3 (Del. Super. Ct. June 30, 2010) ("[I]n a bench trial, it is the Court's role to resolve the conflicts in witnesses' testimony and weigh their credibility."); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 545–46 (Del. Super. Ct.  2005), *aff'd,* 886 A.2d 1278 (Del. 2005) (setting forth "the customary Delaware standard" a trial judge applies when assessing trial testimony and evidence in a bench trial).

[7]  *See, e.g.*, Del. Super. Ct. Civ. Pattern Jury Instr. 4.1 (Burden of Proof by a Preponderance of the Evidence); *id.* at 4.2 (Evidence Equally Balanced); *id.* at 23.1 (Evidence—Direct or Circumstantial); *id.* at 23.9 (Credibility of Witnesses—Weighing Conflicting Testimony); *id.* at 23.10 (Expert Testimony).

[8]  *Intermec IP Corp. v. TransCore, LP*, 2023 WL 5661585, at *2 (Del. Super. Ct. Aug. 23, 2023).

finding of fact may be considered the Court's conclusion of law on that point.[9]

## A. TYSON'S OFFER TO BUY AND CONTINGENCY PLAN

Tyson, via River Valley, was dead set on entering the poultry rendering market in the Southeast.[10]  It had two options: buy an existing plant or build its own and compete.[11]  It found the first option more desirable.[12]

In the years prior to the APA, Tyson had approached API's CEO, Thomas ("Tommy") Bagwell, about selling.[13]  Mr. Bagwell wasn't interested.[14]  But Tyson didn't cease its efforts to enter the region.[15]

Tyson began negotiations with the biggest rendering raw material suppliers in the region, Koch and Wayne.  They had been API's suppliers for decades.[16]  And when API's contracts with Koch and Wayne were set to expire, Koch and Wayne contracted with Tyson to supply its future plants (whether Tyson acquired or built

---

[9]  *Id.* (citing *Facchina Constr. Litigations*, 2020 WL 6363678, at *2 n.12 (Del. Super. Ct. Oct. 29, 2020), judgment entered *sub nom. Facchina Const. Litigations* (Del. Super. Ct. 2020) (collecting authority)).

[10]  11/18/24 Trial Tr. at 19–21.

[11]  *Id.* at 21–25.

[12]  *Id.* at 28–29 ("Because through the process over the year or so of the process, we decided that we were better off to go buy instead of build."), 291.

[13]  *See id.* at 38–39.

[14]  *Id.*

[15]  *See, e.g.*, 11/18/24 Trial Tr. at 22–24.

[16]  *See id.* at 37–40, 126; *see also* DTX–1038 (Kaminsky Dep.) at 76.

them) at a significantly higher profit margin.[17]  In fact, Tyson admits that these contracts' terms were so beneficial to the suppliers that Tyson was prepared to incur a loss on them.[18]  But the loss was a calculated business decision because these contracts were crucial to Tyson's success; since chicken renderings can't be hauled long distances without going rancid, suppliers are ideally located within 60 miles of the rendering processing facilities.[19]  This significantly limits the number of viable suppliers.  And Tyson successfully locked up two of the region's key suppliers for the ensuing ten years.[20]

With these contracts in hand, Tyson once again approached Mr. Bagwell.[21] Mr. Bagwell reluctantly entered negotiations with Tyson because he claimed that, without his suppliers, he had no other choice.[22]

As part of API's counterclaims, API alleges that Tyson was lying about its intentions to build its own plant in the southeast.[23]  API claims that Tyson's

---

[17]  *See* 11/18/24 Trial Tr. at 130–31.

[18]  *See id.* at 171–72.

[19]  *Id.* at 271.

[20]  *Id.* at 272–73.

[21]  *See* CX–2 (explaining that the Tyson-Koch offal purchase agreement was finalized on May 22, 2017, and the first meeting between Tyson and API was on June 28, 2017).

[22]  *See* 11/20/24 Trial Tr. at 220–22 ("With Tyson having more than 40 percent of my raw material affirmatively locked up under contract, that effectively ruined my company, and I was in a blind despair, freaking panic about if they have got those contracts tied up, how in the hell did they do it. And they have just effectively financially ruined my company . . . .") (D.I. 687).

[23]  API Opening Br. at 8–9 (D.I. 678).

statements were false and solely used to fraudulently induce API into selling.[24] The credible trial evidence says otherwise.

## B. API'S PROCESS CHANGE TO REMOVE SPN[25] STICKWATER

In preparation for the acquisition, API created a "to-do" list of projects that needed to be completed before due diligence began. Item Number One on that list was removing SPN stickwater from its pet food meal process.[26]

Why was that so important? Two reasons. *First*, SPN stickwater wasn't supposed to be used in API's production processes.[27] SPN stickwater is a byproduct of the SPN process that contains protein, grit, and fat that is washed off the chicken, which can then be turned into a concentrate.[28] In most instances its usage seems, at best, disfavored. And some of API's buyers' contracts specifically prohibited the

---

[24] *Id.* at 42–45.

[25] In poultry processing, "SPN" generally refers to Secondary Processing Nutrients. These are byproducts of wastewater treatment at poultry processing plants that can be collected, treated, and rendered into other usable feed materials.

[26] *See* PX–590 (Green Dep.) at 55–56; *see also* PX–214; *see also* PX–638 (stating that Goal Number Three was to "have a plan and or process in place to remove SPN stickwater from API's waste heat systems").

[27] *See, e.g.*, PX–211.

[28] *See* 11/19/24 Trial Tr. at 18–20 (D.I. 680). The Court understands that API takes issue with the use of various labels mentioned during this litigation—"clarifier sludge", "SPN", "stickwater"—almost synonymously to describe the material spoken of now. The Court understands, too, the distinctions and the different meanings ascribed to such. But API's parsings are now of little moment to the resolution of the contested issues.

The credible evidence demonstrates that API knew well that what will be referred to hereinafter as "SPN Stickwater" was a proscribed substance in its particular processing under the agreements it had and representations it made.

inclusion of SPN stickwater in their products.[29] That notwithstanding, API had been using SPN stickwater in its processes for at least the previous ten years.[30] Why? Because *second*, the use and inclusion of SPN stickwater was more cost effective. Removing SPN stickwater from the process was costly, would decrease the final product yield, and would significantly lower API's profits.[31]

Due to the potential sale to Tyson, API determined that—to conceal its past practices—SPN stickwater had to be removed from its processing before due diligence commenced.[32] So, API undertook the SPN stickwater removal process with a very tight and strict timeline.[33] The process change was initially estimated to take six months, but API effectively did it in about six weeks.[34] Completing this removal process was so important to API that it offered significant bonuses to its

---

[29]  *See* 11/20/24 Trial Tr. at 69 ("Q: The Nestle contract specs prohibited, quote, clarifier sludge ("SPN"), correct?  A:  Yes").

[30]  11/19/24 Trial Tr. at 20.

[31]  *See* 11/21/24 Trial Tr. at 185–86 (D.I. 688); *see also* Green Dep. at 196:

> Q:  Did there ever come a point in time when you realized what the impact was on Cumming with respect to the SPN removal project?
>
> A:  So there was a decline in the profitability at Cumming.  I was never able to put my finger on exactly what resulted in that during the time that I was with Tyson. Could have part of that been associated with the process change?  I think it could have been.

[32]  *See* PX–645; *see also* 11/19/24 Trial Tr. at 61–62.

[33]  *See* 11/19/24 Trial Tr. at 61–62.

[34]  *Id.* at 61–63.

team to get it done.[35]  And, the total cost of the project was over $2 million.[36]

Ultimately, API succeeded in completing the removal process before the start of due diligence.[37]

## C. API'S CONDUCT AND CONCEALMENT DURING DUE DILIGENCE

API never informed Tyson of its past SPN stickwater practices or its SPN stickwater removal project because it would have negatively impacted API's valuation.[38]  At the beginning of negotiations, Mr. Bagwell relied on 7x EBITDA to estimate API's worth at about $518 million.[39]  But an independent evaluation by UBS—one, done without notice of the SPN stickwater removal—came in at a high

---

[35]  *E.g.*, PX–1007 ("In addition to the $25,000 special bonus related to [one API supervisor]'s work on the SPN process at Hanceville, [he] is also to receive a special one-time bonus payment in the gross amount of $25,000 related to work he has done at Cumming during 2017.").

[36]  11/21/24 Trial Tr. at 186–88:

> Q: So at a minimum, the company spent 1.65, $1.7 million in Cumming and some amount in Hanceville to implement this SPN stickwater removal project that you believe improved the quality of the pet food meal at API, yes?
>
> A: Yes.

[37]  11/19/24 Trial Tr. at 135–36, 160; DTX–1007; 11/21/24 Trial Tr. at 189–90:

> Q: You never told Tyson that API was putting SPN stickwater in pet food meal, right?
>
> A: No, we did not.
>
> Q: And you never told Tyson that API changed its past practice to stop putting SPN stickwater in pet food meal, did you?
>
> A: No, we did not.

[38]  *See* 11/21/24 Trial Tr. at 189–90; *see also* 11/25/24 Trial Tr. at 12–14 (explaining the difference in value of the plants taking into account its stickwater use).

[39]  11/21/24 Trial Tr. at 27.

of $830 million.[40]  Mr. Bagwell was ecstatic and asked Tyson for a purchase price of $850 million.[41]  The first letter of intent ("LOI") was based on an $850 million purchase price.[42]

To ensure that due diligence supported the $850 million purchase price, API handed over past financial records without disclosing the intervening SPN stickwater change.[43]  And terms on balance sheets and expenses associated with the SPN stickwater removal project were listed under non-descript labels to not raise any suspicion.[44]

After the signing of the second LOI, Tyson began site inspections.  API took additional steps to ensure that no employee would mention any "past practices," including the removal of SPN stickwater.[45]  No doubt, API knew its $850 million purchase price was in danger if Tyson discovered its past practice of using SPN stickwater in its production processing.

---

[40]  PX–166 (UBS Valuation).

[41]  11/21/24 Trial Tr. at 33–34.

[42]  PX–1045 (Email with First LOI attached); 11/21/24 Trial Tr. at 33–35; 11/20/24 Trial Tr. at 251–52.

[43]  *See, e.g.*, 11/21/24 Trial Tr. at 189–90.

[44]  DTX–1007.

[45]  *See, e.g.*, PX–528; 11/19/25 Trial Tr. at 67–69:

> Q:  [P]rior to Tyson acquiring API, did you tell anyone at Tyson that API had a business practice of putting SPN into its pet food meal at its Cumming and Hanceville B plants?
>
> A:  I was told not to.

## D. THE PARTIES' ASSET PURCHASE AGREEMENT

On August 20, 2018, the parties signed and executed the APA.[46] Through the APA, Tyson bought API's Cummings and Hanceville poultry rendering plants in Alabama and Georgia for a total price of $865.8 million.[47]

The APA had several representations and warranties to ensure that API: (1) had remained consistent with past practices;[48] (2) provided accurate books and records;[49] (3) was in compliance with its contractual requirements;[50] (4) was in compliance with laws and government regulations;[51] and (5) had disclosed all environmental assessments, audits, investigations, and reports.[52] Outside of the representations and warranties, the APA has a no-reliance provision.[53]

The APA also has indemnity rights for both parties. Article 10.1 grants Tyson indemnity rights "for the full amount of any such Losses relating to, arising out of or resulting from[:]"

> (a) any inaccuracy in any representation, or the breach of any warranty, made in Article IV (for purposes of determining whether an inaccuracy or breach exists and calculating any Losses arising from such

---

[46]   *See generally* JX–1 (APA).

[47]   APA § 1.5(a); *see* 11/20/24 Trial Tr. at 251.

[48]   APA § 4.26.

[49]   *Id.* §§ 4.5(b), (d).

[50]   *Id.* § 4.21(b).

[51]   *Id.* §§ 4.13, 4.22, 4.23(a)-(b).

[52]   *Id.* § 4.20(g).

[53]   *Id.* § 5.7.

inaccuracy or breach, such representation and warranty shall be read as if it were not qualified by any concept of "material," "materiality" or "Material Adverse Effect" (other than Section 4.5(b), Section 4.26(b) and the word "Material" in the term "Material Acquired Contracts" and the categories of "Material Acquired Contracts" in Section 4.9(a)) . . .[54]

As long as the written indemnity notice is properly noticed by:

stat[ing] the nature and basis thereof, the amount of the asserted Losses and the method by which such asserted Losses were calculated; provided, however, that the Indemnified Person may subsequently revise the basis for such Indemnity Claim and the amount of asserted Losses asserted as well as the method by which such asserted Losses are calculated.[55]

But "the failure to provide such prompt notice does not impair the rights of the Indemnified Person or limit the obligations of the Indemnifying Party hereunder except to the extent that such failure materially compromises or prejudices any right of the Indemnifying Party."[56]

Under Article 1.3(a), API is also entitled to indemnification for "assumed liabilities," defined as:

all Liabilities of Sellers to the extent arising from the operation of the Business in the ordinary course of business, including the Liabilities set forth on the Financials (to the extent not satisfied in the operation of the Business in the ordinary course prior to the Closing Date).[57]

For any breach, the parties agreed to an escrow deductible of $4.125 million

---

[54] APA § 10.1(a).

[55] *Id.* § 10.4(a).

[56] *Id.*

[57] *Id.* § 1.3(a).

and a damages cap of $55 million.[58]

## E. TYSON'S TAKEOVER AND SUBSEQUENT DISCOVERIES

After Tyson took possession of the facilities, it noticed a variety of issues, including lower profits and environmental concerns.[59] Many of the environmental and engineering issues at the facilities were discussed in the undisclosed Reid Report.[60] Tyson sued after it discovered API's past practice of using SPN stickwater, its concealment of the SPN stickwater removal project, and alleged concealment of environmental issues by not disclosing the Reid Report.[61]

Throughout litigation, when API was asked about the issues and lack of disclosure, API gave a mashup of different, conflicting excuses. Initially, API cited anti-trust concerns as the reason that it did not disclose the SPN stickwater removal project, claiming that its process was "proprietary."[62] In the next breath, though, API said that its use of SPN stickwater wasn't disclosed because "[i]t was not material to the deal."[63] Now, in its final verse, API insists that it did indeed disclose the SPN

---

[58] *Id.* § 10.3(a), (c).

[59] 11/21/24 Trial Tr. at 267–68:

> A: After we acquired the facility – shortly after we acquired the facility, we started having problems at wastewater related to concentrations, loadings and everything else like that, which were above what we were expecting.

[60] *See* DTX–102 (Reid Report); *see also* 11/21/24 Trial Tr. at 269–71, 287–90.

[61] D.I. 2 (Complaint).

[62] 11/18/2024 Trial Tr. at 72–73; 11/20/2024 Trial Tr. at 214; *see, e.g.*, 11/21/24 Trial Tr. at 191–92.

[63] 11/21/24 Trial Tr. at 151.

stickwater removal via its capital expenditure spreadsheet and during one of the parties' deal meetings.[64]

## IV. ANALYSIS AND FINDINGS

As this was a civil trial, both parties had the burden of proving their respective claims by a preponderance of the evidence.[65]

The Court will first address Tyson's claims, followed by API's counterclaims. Additional facts are included now where needed but the Court will, where possible, seek to avoid repetition.

### A. TYSON'S CLAIMS ARE MERITORIOUS, IN PART.

#### 1. API did fraudulently induce Tyson.

Tyson met its burden of proving, by a preponderance of the evidence, that API fraudulently induced it into signing the APA. Fraudulent inducement requires "1) a false statement or misrepresentation; 2) that the defendant knew was false or made with reckless indifference to the truth; 3) the statement induced the plaintiff to enter the agreement; 4) the plaintiff's reliance was reasonable; and 5) the plaintiff was injured as a result."[66]

---

[64] API Reply Br. at 8 n.29 (D.I. 682).

[65] *See, e.g.*, *Navient Sols., LLC v. BPG Off. P'rs XIII Iron Hill LLC*, 2023 WL 3120644, at *10 (Del. Super. Ct. Apr. 27, 2023).

[66] *ITW Glob. Invs. Inc. v. Am. Indus. Partners Cap. Fund IV, L.P.*, 2017 WL 1040711, at *6 (Del. Super. Ct. Mar. 6, 2017) (quoting *In re Student Fin. Corp.*, 2004 WL 609329, at *7 (D. Del. Mar. 23, 2004)); *Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, 2024 WL 1596021, at *15 (Del. Super. Ct. Apr. 12, 2024), *reargument denied*, 2024 WL 3273427 (Del. Super. Ct. July 2, 2024)

To prove its claim, Tyson relied on API's concealment of its past SPN stickwater practices and its covert cessation thereof, along with API's failure to disclose the Reid Report.[67] It says that "had Tyson known the truth, Tyson would have negotiated a reduced price or walked away."[68]

Tyson's complaint that it was fraudulently induced by API's failure to disclose the Reid Report is more appropriately addressed as a breach of a representation and warranty because at trial Tyson focused on the failure to disclose the Reid Report during due diligence and its violation of an express warranty in the APA.[69]

As such, the Court's resolution of the fraudulent inducement claim will focus on the SPN stickwater allegations.

### a. API made several false statements and misrepresentations.

Tyson proved the first element of fraudulent inducement. It requires "(1) an overt misrepresentation; (2) deliberate concealment of material facts; or (3) silence in the face of a duty to speak."[70]

Prior to the execution of the APA, API employed several misrepresentations

("A party must prove each element by a preponderance of the evidence.").

[67] *See* Tyson Opening Br. at 5 (D.I. 677).

[68] *Id.*

[69] *See, e.g.*, 11/18/24 Trial Tr. at 155, 181–84; 11/21/24 Trial Tr. at 259–61.

[70] *Surf's Up*, 2024 WL 1596021, at *15.

to induce Tyson into buying API at an inflated price. API misled Tyson about its anticipated profits by leaving out the SPN stickwater removal project and engaged in pre-contract concealment of its use of SPN stickwater. This is evident through API's actions, like using non-descript labels such as "additional discretionary bonus" and "evaporator and FG process upgrade" for its SPN stickwater removal project and its silence about the project during the due diligence process.[71] API's actions include overt misrepresentations, deliberate concealment, and silence when it had a duty to speak during due diligence.

**b. API knew certain representations were false.**

Tyson has proven the second element of fraudulent inducement, which requires that Tyson prove API "had knowledge of the falsity of the representation or made the representation with reckless indifference to the truth."[72]

There is ample evidence of API's knowledge that it was making false representations. Perhaps the two of API's actions that are most compelling are the renaming of the SPN stickwater removal projects and instructing API employees to not comment if asked about past SPN stickwater practices.[73] Mr. Bagwell's texts are also damning; he starts on of his messages with "I don't want to put too much on

---

[71] *See* 11/19/24 Trial Tr. at 134, 258–59; DTX–1007.

[72] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *32 (Del. Ch. Dec. 3, 2018).

[73] *See* DTX–1007; PX–528.

- 17 -

the record" and another with "I didn't want to put anything into email. Which by the way after thinking about it the long email I gave to Don was not sent via email."[74] Such statements are clear, uncontroverted evidence of knowledge of the issue and API's intent to conceal.

### c. API intended for Tyson to rely on its false representations.

Tyson has proven the third element of fraudulent inducement. It requires API to have intended for Tyson to rely on its misrepresentations.[75] In many cases, the "transaction itself may serve as both the motive and opportunity to commit the fraud."[76]

API had a clear motive to commit fraud—receive a significantly inflated price for the sale. API had regional dominance in the poultry rendering market and Mr. Bagwell didn't want to give that up by selling or being forced to compete.[77] But when he chose to sell, he made it very clear that he was not interested in selling "unless Tyson is willing to pay 'really, really stupid money' for the entire company."[78] And API obtained a fraud-fueled premium through active efforts to conceal the SPN stickwater removal project from Tyson. API's deceitful intent is

---

[74] PX–214; PX–211.

[75] *Great Hill Equity*, 2018 WL 6311829, at \*32.

[76] *Surf's Up*, 2024 WL 1596021, at \*17 (quoting *NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at \*13 (Del. Ch. Aug. 2, 2023), *judgment entered*, (Del. Ch. 2023)).

[77] *See* 11/20/24 Trial Tr. at 221, 244.

[78] PX–121.

demonstrated by both circumstantial and direct evidence.

### d. Tyson reasonably relied on API's representations.

Tyson has also proved the fourth element of fraudulent inducement. To satisfy this element, Tyson's reliance must be objectively reasonable and on a material fact.[79] Too, Tyson mustn't have been aware of the misrepresentation when it acted.[80]

Tyson was objectively reasonable in relying on API's representations. The unreliability of API's financials for projections wasn't something that Tyson could have been aware of without express and proper disclosure from API—especially considering the lengths that API went to conceal the specifics that engendered that unreliability. Without such disclosure, Tyson had no reason to question API's financials or other due diligence because API's financial statements appeared (and perhaps were) otherwise facially accurate[81]—API just concealed the existence of the SPN stickwater removal project and its likely effect on profits.[82]

But API says that Tyson couldn't have justifiably relied on its representations

---

[79] *Surf's Up*, 2024 WL 1596021, at *18; *Great Hill Equity*, 2018 WL 6311829, at *33.

[80] *Great Hill Equity*, 2018 WL 6311829, at *33; *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2020 WL 1655948, at *30 (Del. Ch. Apr. 3, 2020), *judgment entered*, (Del. Ch. 2020), *judgment entered*, (Del. Ch. 2021).

[81] *See* DTX–1041 (Klemann Dep.) at 142–43.

[82] APA Schedule 4.5(a)(i) (discussing factors that could affect future results and including the price of raw materials, utilities, and government regulations).

because Tyson had no intent to "rely" on them.[83]  In API's view, Tyson didn't rely on any of API's financials—Tyson intended to buy no matter what because the sale was a "once in a lifetime opportunit[y]."[84]  Not so.

While there may be some truth to the notion that Tyson was willing to take a loss to ensure the sale would happen, it doesn't mean that it didn't rely on any of API's financials to investigate, evaluate, and mitigate its risk; API actively thwarted any meaningful chance to do so on the SPN/profitability issue.  The financials were heavily depended upon to determine an appropriate purchase price, hence the various stages of due diligence.[85]  In fact, the purchase price was negotiated and adjusted throughout due diligence.[86]  In short, there was justifiable reliance.

### e. Tyson was injured by API's false representations.

Tyson  was  injured  by  the  amount  it  overpaid  for  API  due  to  API's

---

[83]  API Opening Br. 32–34.

[84]  *Id.* at 35.

[85]  PX–259; *see* 11/18/24 Trial Tr. at 59–60:

> Q: All right. And then if we go down a little bit further in that paragraph, it says "If the overall results of due diligence are satisfactory to Tyson and Tyson moves forward with a final definitive bid, the parties anticipate any adjustments to the nonbinding offer would address any individual material issues identified in the due diligence process." What did that mean to you?
>
> A: I think it meant the same as we talked about before on the last LOI, that if during due diligence if anything of material interest came up, we would investigate completely and then we would make a decision whether to renegotiate the price up and then -- or walk away.

[86]  PX–1043 (stating that the purchase price would be between $800 million and $850 million); PX–259 (setting a preliminary, non-binding purchase price of $825 million).

concealment and withholding of material information. The damages will be fully evaluated below.

### 2. API breached some of its APA-borne indemnification obligations.

Tyson has met its burden of proving that API breached its indemnification obligations for some of the representations made in the APA. Tyson claims that it is entitled to indemnification for certain false representations and warranties, specifically Articles 4.5(b), (d), 4.13, 4.20(g), 4.21(b), 4.22, and 4.23(a)-(b).

Article 10.1 of the APA provides indemnity by API for all losses "relating to, arising out of or resulting from" any inaccurate representation or warranty in Article 4.[87]

But prior to looking at the merits of the claim, the Court must address API's postulations that Tyson failed to satisfy conditions precedent to indemnification.

### a. No conditions precedent bar Tyson's recovery.

API raises three arguments suggesting that its obligation to indemnify hasn't been triggered. None work.

#### i. *Tyson complied with the APA's notice requirements and its claims are not time barred.*

API claims that Tyson failed to comply with the APA's notice provision for indemnity claims and that some of Tyson's claims for breach are time-barred.

---

[87] APA § 10.1(a).

Specifically, it says that the alleged Article 4.26 breach wasn't properly noticed within the survival period.[88]  Also, according to API, Article 4.5(b) was never properly identified in any indemnity notice or pleading so it should not be considered by the Court.[89]

Per the APA, an indemnity obligation only arises after proper notice.[90]  Tyson noticed its claim for indemnification for breach of contract on December 17, 2019.[91]  It requested indemnification for the "fraudulently inflated purchase price" that exceeded the escrow amount.[92]  But its notice did not specifically mention Article 4.26 until its later supplement.[93]  And Tyson never specifically noticed its claim under Article 4.5(b).[94]

Regardless, the Court has already ruled on this issue and found that any notice issues—including alleged untimeliness—regarding Article 4.26 do not bar indemnification.[95]  And that previous ruling extends to Article 4.5(b) claims as

---

[88]  API Opening Br. at 27–29.

[89]  *Id.* at 20.

[90]  Article 10.4 states that the written notice must be given for "any such claim to Sellers, and if any Seller Indemnified Person has notice of facts or circumstances that could reasonably result in an Indemnity Claim against Buyer." APA § 10.4(a).

[91]  Tyson Opening Br. at 38.

[92]  PX–936.

[93]  PX–937.

[94]  *Id*.

[95]  Tyson Opening Br. Ex. B (Mot. in Limine Tr.), at 12–13 ("Given the notice, pleading notice, of Delaware practice, and more particularly, the history of this case, it, indeed, was pled, although it was not specifically identified as 4.26.").

well.[96]  Simply put, at this post-trial point, we are well past evaluation of supposed procedural defects that were supposedly present when the complaint was filed in 2019.  There are no notice defects that bar Tyson's recovery on the merits that have been the subject of a full trial.

### ii. The escrow deductible is of no consequence at this stage.

API now alleges that Tyson cannot prevail because it did not prove that its losses were greater than the $4,125,000 deductible at the time the complaint was filed.[97]

The Court previously suggested that API could re-raise this issue after discovery was completed.[98]  But API didn't then and, therefore, API missed its window to raise this issue in some dispositive way.

As the trial record stands, Tyson has alleged that they overpaid by at least

---

[96]  *See id.*

[97]  Article 10.3(a) of the APA states:

> neither any Buyer Indemnified Person nor any Seller Indemnified Person, respectively, has any recourse against Sellers, or Buyer, as the case may be, under this Article X unless and until the aggregate amount of all Losses incurred or suffered by Buyer Indemnified Persons or Seller Indemnified Persons indemnifiable pursuant to Section 10.1(a), or Section 10.2(a), as the case may be, exceeds $4,125,000 ("Deductible"), in which event the Indemnified Person is entitled to indemnification for Losses suffered only to the extent in excess of the Deductible.

APA § 10.3(a).

[98]  *See River Valley Ingredients*, 2021 WL 598539, at *7 ("The Court finds that API's argument fails because Tyson is not required, at this juncture, to show that it incurred losses in excess of $4.125 million. However, API potentially could raise this argument again if, after the discovery process is completed and the parties have a more concrete estimate of damages, Tyson cannot prove it suffered losses beyond the designated amount.").

$102 million.[99]  So, this escrow-threshold argument is unavailing on its merits too.

In the end, there are no unsatisfied conditions precedent preventing review of the merits of Tyson's breach-of-contract claim.

**b. Tyson has proved that API breached certain representations and warranties and, in turn, has certain indemnification obligations.**

To prove breach of the APA, Tyson must prove that there was (1) a contractual obligation, (2) a breach of that obligation, and (3) resulting damages.[100]  The Court will address each of the alleged breaches in turn.

### i. *Article 4.26 – The past practices representation was breached.*

API breached its past practices representation, which reads:

Absence of Certain Changes. Since the December 31, 2017, (a) Sellers have conducted the Business only in the ordinary course and in a manner consistent with past practice, and (b) there has been no Material Adverse Effect.[101]

The Court has already found that SPN stickwater was removed from API's process right before due diligence began.[102]  But, API claims, its SPN stickwater removal was consistent with past practices because "API had not included SPN stickwater in pet food during most of its 75-year history."[103]

---

[99]  Tyson Reply Br. at 18 (D.I. 681).

[100]  *Interim Healthcare*, 884 A.2d at 548.

[101]  APA § 4.26.

[102]  *See* 11/19/24 Trial Tr. at 61–62.

[103]  API Reply Br. at 12.

Even if this otherwise unsupported assertion that API didn't *always* use SPN stickwater was true, this is an ineffectual counter.[104] The issue was the lack of disclosure for the recent change—the SPN stickwater removal project. A past practice representation and warranty is intended to assure the buyer that the seller's past financial records are reliable predictors and that there have been no substantial changes or material adverse effects that need to be accounted for.[105] Accordingly, Tyson was interested in knowing and having warranted the immediate past practices that underpinned the financials it was looking at to aid in negotiating an appropriate purchase price.

It had been API's practice to use SPN stickwater since 2012; that use of SPN stickwater had become a relevant "past practice" of API's.[106] The substantial change in API's production process to remove SPN stickwater wasn't consistent with that past practice and was a violation of the Article 4.26 representation and warranty.

### ii. Articles 4.5(b) and (d) – The books and records representations were not breached.

API did not breach its books and records representations which, as written, is

---

[104] *See id.* at 12–13.

[105] *See Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *11 (Del. Ch. June 11, 2020) ("Other decisions of this court are in accord, finding that ordinary course representations either were actually violated or were well-pled to have been violated when: seller's employees manipulated financial records in deviation from its past accounting practices; a company substantially restructured its business; and employees of a company schemed to start a competing business and redirected assets to that competing business during the pendency of a transaction.").

[106] *See* 11/20/24 Trial Tr. at 90–91; *see also* DTX–19.

a narrow one. Articles 4.5(b) and (d) covered the representations and warranties regarding API's books and records.

Article 4.5(b) states:

The Financials (i) were prepared in accordance with the books of account and other financial records of Sellers, (ii) fairly present in all material respects the financial condition and results of operations of Sellers as of the dates thereof or for the periods covered thereby, (iii) have been prepared in accordance with GAAP applied on a basis consistent (except as otherwise noted therein and subject, in the case of the interim Financials to normal, recurring year-end adjustments and the absence of notes and the absence of all eliminating entries used in consolidated financial statements).[107]

And 4.5(d) states:

The books of account and other financial records of Sellers are complete and correct in all material respects and represent actual, bona fide transactions and have been maintained in accordance with sound business practices.[108]

On their face, the representations were compiled with as stated and numerically accurate—API didn't tamper with its books and records, nor tinker with the numbers. They were misleading, however, as to what backed those inputs. And, no doubt, when handing over its financials in due diligence and then making those representations, API hoped that Tyson would rely on its previous financials as an indication of future financial performances, including anticipated profits.

Strictly speaking though—while not to be excused—this wasn't a separate

---

[107] APA § 5.4(b).

[108] *Id.*

breach of the Article 4.5(b) and (d) representation itself; it was the breach of Article 4.26 that the Court just found above.[109]  Tyson has not met its burden here.

### iii. Article 4.21(b) – The contractual compliance representation was breached.

API breached its representation that it had complied with its contractual obligations to third parties. More specifically, this representation was intended to assure Tyson that API had been complying with its contracts with its buyers.  Article 4.21(b) states:

> All Products manufactured, processed, distributed, shipped, or sold by Sellers and any services rendered by it in connection therewith have conformed in all material respects with all applicable contractual commitments and all express or implied warranties, or if not, any such commitments and warranty claims have been satisfied. Except as set forth on Schedule 4.21(b), no Liability exists for repair, replacement or damage in connection with such sales or deliveries.[110]

This representation wasn't accurate.  As the Court interprets API's supply agreement with Nestle, the use of SPN stickwater was prohibited.[111]  The fact that Nestle wasn't aware of the non-conformity is immaterial because API was clearly aware of its non-compliance.  In fact, its non-compliance was discussed in depth and even kept Mr. Bagwell up at night.[112]

---

[109] *See id.* § 4.26 ("Absence of Certain Changes. Since the December 31, 2017, (a) Sellers have conducted the Business only in the ordinary course and in a manner consistent with past practice, and (b) there has been no Material Adverse Effect.").

[110] *Id.* § 4.21(b).

[111] *See* 11/20/24 Trial Tr. at 69.

[112] *See, e.g.*, PX–214.

As such, API wasn't complying with the contract until it removed SPN stickwater from its process right before the start of due diligence. Recall, the operative language warranted that the "[p]roducts manufactured, processed, distributed, shipped, or sold by" API "conformed in all material respects with all applicable contractual commitments."[113] Note, that these are voiced in the past tense, *i.e.*, as things that have happened. Since the Nestle contract had been and was still active and API's pre-SPN-process-change products were not in compliance therewith—API breached Article 4.21(b).

### iv. Articles 4.13, 4.22, 4.23(a)-(b) – The legal compliance representations were not breached.

Tyson did not meet its burden in proving that API was not in compliance with relevant regulations and breached Articles 4.13, 4.22, 4.23(a)-(b). Tyson claims that because its product was adulterated with SPN stickwater and API labeled its product as "poultry by-product meal," it was not in compliance with the Association of American Feed Control Officials' ("AAFCO") regulations and other regulations.[114]

For this Court to find that API's products weren't AAFCO compliant would be quite a stretch. First, there's been no official finding by AAFCO or any other regulatory body that API wasn't complying with a specific regulation or law.[115]

---

[113] APA § 4.21(b).

[114] Tyson Reply Br. at 34–35.

[115] *See* DTX–1031 (Swann Dep.) at 90, 94 (stating that he wasn't aware of API violating any AAFCO or FDA laws or regulations or API being subject to any relevant recalls).

Second, the Court found the testimony presented about the difference between "feed grade" and "pet grade" materials unilluminating. As best the Court can tell from the record developed, the industry itself doesn't seem to have a bright line rule on the difference between "feed grade" and "pet grade."[116] As such, Tyson didn't prove by a preponderance of the evidence that API's products violated any applicable regulations and that API breached any legal compliance representations.

### v. Article 4.20(g) – The environmental report disclosure representation was not breached.

Tyson did not meet its burden in proving that API breached its report disclosure representation. Article 4.20(g) assures Tyson that:

> To the Knowledge of Sellers, Sellers have delivered or made available to Buyer copies of all environmental assessments, audits, investigations, reports or the like that were created or prepared within the last five (5) years and that are in the possession or control of a Seller or its Affiliates affecting or relating to the Facilities, the Business, the Transferred Assets, or any real property currently owned or operated in connection with the Business.[117]

Tyson claims that API's failure to disclose the Reid Report created a misrepresentation. Not so.

To be clear, the Reid Report is an engineering report with environmental implications. It is titled "Confidential Engineering Evaluation" with a sub-title of

---

[116] *See* 11/25/24 Trial Tr. at 93–99 (discussing AAFCO's non-exhaustive list of poultry parts and explaining that AAFCO's definitions focus on mislabeling product as "human grade" and "pet-food grade" is not defined by AAFCO).

[117] APA § 4.20(g).

"Environmentally and Economically Responsible Engineering."[118] API stated at trial that the Reid Report, prepared by engineers, wasn't "environmental" and, if it wasn't produced during due diligence, it was because API didn't view it as an environmental report.[119] No witness could say for certainty whether or not the report was handed over.[120]

While it would have been prudent for API to have handed over the Reid Report—and for there to have been a clearer record on the fact that had occurred—the Court does not view the report itself an "environmental" report that implicates this representation. Moreover, the Court is not convinced that API was deliberate in its failure to disclose—if it did, in fact, fail to disclose—the Reid Report.

To the Court, the evidence on these points is in equipoise. Accordingly, the Court cannot find a breach of Article 4.20(g).

### 3. Damages are awarded to Tyson.

API had a contractual obligation to indemnify Tyson for the misrepresentations in Articles 4.26, and 4.21(b). Since API did not compensate Tyson for those misrepresentations, API is in breach of its indemnity obligations. As such, API must pay Tyson for the resulting damages. The damages therefor—

---

[118] PX–438; *see also* 11/26/25 Trial Tr. at 219 (calling the Reid Report an "engineering report that addressed certain potential environmental issues") (D.I. 689).

[119] *See* 11/21/24 Trial Tr. at 200.

[120] *See id.* at 146–47.

which the Court finds to specifically overlap those for the fraud found earlier—are discussed below.

## B. ALL API'S COUNTERCLAIMS FAIL

API didn't satisfy its burden of proof on any of its counterclaims.

### 1. Tyson did not fraudulently induce API.

While Tyson's deal tactics weren't the friendliest, they didn't constitute fraudulent inducement. Fraudulent inducement requires:

> (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[121]

Tyson made no false representation to API. API claims that Tyson never had an intent to build in the region so it misrepresented that it would build plants there if it didn't buy API's.[122] There's ample credible evidence to the contrary.[123]

Of course, it was Tyson's preference to buy pre-existing plants and buy-out the competition instead of building from scratch and competing.[124] But it was prepared to do either; regardless of the option, Tyson ensured that it had suppliers

---

[121] *Maverick Therapeutics*, 2020 WL 1655948, at *26 (quoting *Great Hill Equity*, 2018 WL 6311829, at *32).

[122] API Opening Br. at 42.

[123] *E.g.*, 11/18/24 Trial Tr. at 207, 228, 240–41.

[124] *Id.* at 44–45.

locked up.[125] Tyson's contracts with the suppliers clearly outlined the parties' obligations based on the possibility of building or buying.[126] The fact that Tyson didn't take major concrete moves towards building its own plant is inconsequential. Such steps aren't required, but merely that which API thinks should have been done to prove the validity of Tyson's bargaining positions.[127]

Tyson's plan to build was simply its contingency that was never needed. Tyson made no materially false statements to API to induce them into the APA; API failed to meet its burden.

## 2. Tyson did not tortiously interfere or unfairly compete.

API did not meet its burden in proving tortious interference or unfair competition. API claims unfair competition, tortious interference with its contractual business relations, and tortious interference with its prospective business relations. Since both parties addressed these claims jointly, the Court will do the same.[128]

API needed to prove "(1) a reasonable probability of a business opportunity; (2) intentional interference by a defendant with that opportunity; (3) proximate

---

[125] *Id.* at 79–80, 137–38; 11/19/24 Trial Tr. at 212–13.

[126] *See* 11/18/24 Trial Tr. at 232–33.

[127] *See* API Reply Br. at 1–2.

[128] API Opening Br. at 48 (stating "all of these elements similarly are satisfied here" and "API's damages for unfair competition are the same as those addressed in connection with its claim for tortious interference."); Tyson Reply Br. at 31–34.

causation; and (4) damages."[129]

### a. API satisfies the first element of a reasonable probability of a business opportunity.

For the first element—a reasonable probability of a business opportunity— API was required to "identify a specific party who was prepared to enter into a business relationship but was dissuaded from doing so by the defendant."[130] API had a reasonable business expectancy with its suppliers, Koch and Wayne, from its decades long relationships with them.[131] The suppliers expressed that they weren't fully content with their contracts with API, but they made no indication that they wouldn't have re-upped the contract if Tyson hadn't offered them another option.[132] The evidence presented at trial proved that, without Tyson, the suppliers likely would have continued their contracts with API.

### b. There was no intentional, wrongful interference.

The second element requires that Tyson's interference was intentional and wrongful.[133] Wrongful interference may be achieved through improper economic

---

[129] *OptimisCorp v. Waite*, 2015 WL 5147038, at *76 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Del. 2016) (stating the elements for tortious interference with prospective business relations) (citing *Beard Research, Inc. v. Kates*, 8 A.3d 573, 607–08 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010)).

[130] *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017) (citing *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009)).

[131] 11/26/24 Trial Tr. at 28–29 (D.I. 689).

[132] *See* 11/21/24 Trial Tr. at 214–16.

[133] *KT4 Partners LLC v. Palantir Techs. Inc.*, 2021 WL 2823567, at *13 (Del. Super. Ct. June 24, 2021) ("Delaware law requires courts to consider these elements in light of a defendant's privilege

pressure.[134]  Typically, a party exerts improper economic pressure that might require a Court to intervene when the pressure forces a competitor out of business.[135]

According to API, Tyson's actions were wrongful because it used improper economic pressure by contracting with its suppliers for ten-year terms, which would eventually put API out of business.[136]  API asks the Court to grant relief because Tyson made deals with the region's suppliers it could not.

It's important to keep in mind the nature of the poultry rendering business. Due to the product itself, its raw materials can't travel far distances without going rancid.[137]  Tyson had to make a substantial initial investment to become competitive and challenge a dominant producer in the region.  So it did.

Tyson contracted with the region's suppliers, that were also API's suppliers, to "apply pressure on the API transaction," but also as the best means to enter the region if it chose to build.[138]  In response, API had the choice to sell or compete. API could have chosen to fight and find a solution, but it didn't.  It treated the

---

to compete or protect his business interests in a fair and lawful manner. That privilege derives from Delaware's concern that this tort could restrict free competition. As a result, a plaintiff must prove that a defendant's conduct was independently wrongful to prevent the competition privilege from barring recovery.") (citations omitted).

[134] *Preston Hollow Cap. LLC v. Nuveen LLC*, 2020 WL 1814756, at *18 (Del. Ch. Apr. 9, 2020), *judgment entered*, (Del. Ch. 2020).

[135] *Id.*

[136] API Opening Br. at 45–47.

[137] 11/18/24 Trial Tr. at 271.

[138] DTX–472.

possibility of failure and going out of business as an inevitability.

The facts here do not add up to intentional wrongful interference. For example, API attempts to rely on *Preston Hollow Cap. LLC v. Nuveen LLC*, but unlike in that case, there are very few players in this very specific market.[139] Here, API had regional dominance.[140] As such, the Court must look to the distinctive facts here and may be more tolerant of competitive practices in this peculiar small market than might be proper in other circumstances.[141]

In doing so, the Court cannot find that API has proven Tyson's actions to be wrongful. Tyson took an opportunity to expand into a market that had minimal competition. Tyson's means were reasonable; it secured supplier contracts legally and without use of any wrongful means. Based on the unique aspects of the chicken

---

[139] *But cf. Preston Hollow Cap.*, 2020 WL 1814756, at \*18 ("Davern informed Morgan that Nuveen was attempting to make the prohibition on 100% placements 'uniform across [Wall Street].").

[140] 11/18/24 Trial Tr. at 189 ("Q: So API was Tyson's largest rendering competitor. Is that correct? A: In chicken, yes, that's correct."); *see* 11/21/24 Trial Tr. at 157 ("You can't replace the locations. I worked all my life on those plants. Those were the very best locations."); API Opening Br. at 2 ("It would be impossible to re-create today").

[141] *See* Restatement (Second) of Torts § 768 (Am. L. Inst. 1979) (using the following balancing test to determine if the competition is wrongful "(a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint of trade and (d) his purpose is at least in part to advance his interest in competing with the other"), cmt. c (explaining that improper economic pressure requires reviewing "the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective").

rendering business in the region, the Court does not find that Tyson's actions exerted improper economic pressure.

Accordingly, API did not meet its burden of proving tortious interference or unfair competition.

### 3. API isn't entitled to recission or rescissory damages.

API failed to prove that it is entitled to rescissory damages. "Rescission is an equitable remedy that 'results in abrogation or "unmaking" of an agreement, and attempts to return the parties to the status quo.'"[142] But the remedy is used sparingly, as it "will not be granted unless the Court can and does, by its decree, restore the parties substantially to the position which they occupied before making the contract."[143] It's counterpart—rescissory damages—is only given "if the remedy of rescission is impractical but otherwise warranted."[144] Unconscionability may be independent grounds for recission or recessionary damages if there is a unilateral

---

[142] *GB-SP Holdings, LLC v. Walker*, 2024 WL 4799490, at *22 (Del. Ch. Nov. 15, 2024) (quoting *Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982)).

[143] *Craft v. Bariglio*, 1984 WL 8207, at *12 (Del. Ch. Mar. 1, 1984).

[144] *GB-SP Holdings*, 2024 WL 4799490, at *22.

mistake.[145]  Such an award relies on the Court's discretion.[146]

Here, only recessionary damages are at issue.  API suggests that Tyson's interpretation of the APA is unconscionable and based on a unilateral mistake.[147]  A unilateral mistake requires that API "show that it was mistaken and that the other party knew of the mistake but remained silent."[148]  API asserts that it believed it complied with AAFCO.  But it makes no argument that Tyson, for instance, was aware of the non-compliance at the time of the sale and remained silent.[149]  Instead, API claims that there was a "mistake" regarding the terminology in the APA.[150]  This is nowhere near sufficient to meet API's burden.  API has failed to prove that Tyson knew of any sort of mistake, and that Tyson remained silent.

More so, Tyson's actions do not meet the standard for unconscionability because "[a] court rarely will intervene when the contracting parties are both

---

[145] *FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842, 861 (Del. Ch.), *aff'd sub nom. A & R Logistics Holdings, Inc. v. FdG Logistics LLC*, 148 A.3d 1171 (Del. 2016) ("Rescission of a transaction because of a unilateral mistake is an extraordinary remedy. It is only available under Delaware law when a party can demonstrate that (1) the enforcement of the agreement would be unconscionable; (2) the mistake relates to the substance of the consideration; (3) the mistake occurred regardless of the exercise of ordinary care; and (4) it is possible to place the other party in the status quo.) (citation omitted).

[146] *Telstra Corp. v. Dynegy, Inc.*, 2003 WL 1016984, at *8 n.22 (Del. Ch. Mar 4, 2003).

[147] API Opening Br. at 49–51.

[148] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 679–80 (Del. 2013) (citing *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1143 (Del. 2002)).

[149] API Opening Br. at 50–51.

[150] *Id.* at 51.

commercial entities or otherwise sophisticated."[151]  Here, we have two sophisticated

parties that engaged in ample negotiation and due diligence to execute the APA.

Much more is needed to invoke the doctrine of unconscionability.  API also attempts

to claim that there is unconscionability because API was valued at significantly more

than Tyson paid.[152]  But this claim is unavailing too because—as the Court will

explain—Tyson actually overpaid.

Accordingly, API is not entitled to recessionary damages.

### 4. API is not entitled to indemnification.

API didn't meet its burden in proving that it's entitled to indemnification.  API

claims that Tyson violated Articles 1.3 and 10.2 of the APA by failing to indemnify

API for the *Sipsey* litigation.[153]  Both API and Tyson were named defendants, but

Tyson didn't participate in the settlement and contested its indemnity obligation

from the start.[154]

For the *Sipsey* litigation to be covered, it must be an "assumed liability."[155]

---

[151]  *James v. Nat'l Fin., LLC*, 132 A.3d 799, 826 (Del. Ch. 2016).

[152]  API Opening Br. at 51.

[153]  *Id.* at 52–53.

[154]  *See* DTX–1060.

[155]  Defining "assumed liabilities" as:

> all Liabilities of Sellers to the extent arising from the operation of the Business in
> the ordinary course of business, including the Liabilities set forth on the Financials
> (to the extent not satisfied in the operation of the Business in the ordinary course
> prior to the Closing Date).

APA § 1.3(a).

The definition is unambiguous and requires that the liability be: (1) of API's; (2) via the normal course of business; and (3) one that hasn't been satisfied prior to closing.[156] The provision states that the obligation is "not satisfied in the operation of the Business in the ordinary course prior to the Closing Date."[157] This requires that the liability be present prior to closing. But the *Sipsey* issue didn't occur until post-closing.[158] As such, it can't be an assumed liability under the APA.

API also claims that Tyson is liable under common-law.[159] "Common law indemnification, in contrast, involves the responsibility of a third party to pay for another's liability."[160] But API cannot prevail via this route either. Delaware courts have permitted common-law or implied indemnification claims only when there is no contractual right to indemnification.[161] Since there is an indemnification agreement between the parties, the Court won't entertain a common-law based claim.

---

[156] *Terrell v. Kiromic Biopharma, Inc.*, 2025 WL 249073, at *3 (Del. Jan. 21, 2025) ("This Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement.' 'When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions unless it appears the parties intended a special meaning.'") (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) and *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013)).

[157] APA § 1.3(a).

[158] *See* API Opening Br. at 52.

[159] *Id.* at 52–53.

[160] *Levy v. Hayes Lemmerz Int'l, Inc.*, 2006 WL 985361, at *11 (Del. Ch. Apr. 5, 2006).

[161] *See, e.g.*, *Davis v. R.C. Peoples, Inc.*, 2003 WL 21733013, at *2 (Del. Super. Ct. July 25, 2003).

Regardless, API chose to enter a settlement agreement.[162] In fact, the settlement agreement specifically contained a provision that would govern the repayment provision if there was any indemnity from Tyson.[163] Put simply, API chose to settle the entire claim knowing that its right to indemnity was being contested and may never be actualized.[164]

Accordingly, API is not entitled to indemnification for the *Sipsey* litigation.

## 5. API hasn't proven any breach of the TSA.

API did not meet its burden of proving that Tyson breached the TSA.

A breach of contract claim has three elements: "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."[165]

API claims that Tyson's claims should be stricken because it intentionally breached the TSA.[166] But API failed to even enter the TSA into evidence during trial.[167] On this record, the Court can't pinpoint the contractual obligation Tyson

---

[162] *See* DTX–1060 (*Sipsey* Settlement).

[163] *Id.*

[164] *Id.* ("contribute to the settlement to resolve the Lawsuit in exchange for a release of any disputes . . . while preserving any rights it may have to recover its payment under [its] indemnity rights under the asset Purchase Agreement between Crossroads and Tyson Foods, Inc.").

[165] *Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1279 n.28 (Del. 2016).

[166] API Opening Br. at 52.

[167] API only entered correspondence regarding the TSA into evidence. *See* DTX–643; DTX–651; DTX–652, DTX–623, DTX–656.

was alleged to have had or breached.  As such, this API claim fails.

### 6. Tyson did not commit civil conspiracy.

API did not meet its burden in proving civil conspiracy.  "Civil conspiracy is not an independent cause of action; it must be predicated on an underlying wrong. Thus, if plaintiff fails to adequately allege the elements of the underlying claim, the conspiracy claim must be dismissed."[168]  Since all of API's other claims fail, it cannot prevail on its civil conspiracy count.

## C. TYSON IS AWARDED $55 MILLION IN DAMAGES, NOT INCLUDING INTEREST.

Based on the Court's findings above, Tyson is entitled to damages for API's fraud and misrepresentations.  API is not entitled to damages.

### 1. There are no bars to Tyson recovering damages.

First, API claims that, under the APA, Tyson's "losses" must exclude any "amounts calculated by any multiple of the applicable Losses solely based on any multiple used by Buyer to determine purchase price."[169]  That provision is not applicable to the damage calculations presented at trial.  Tyson relied upon the flat purchase price agreed to by both parties and the discounted cash flow (DCF) that was adjusted for the misrepresentations by using data of past revenue and estimated

---

[168] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 892 (Del. Ch. 2009) (citing *Ramunno v. Cawley*, 705 A.2d 1029, 1039 (Del. 1998) and *Transched Sys. Ltd. v. Versyss Transit Solutions, LLC*, 2008 WL 948307, at *4 (Del. Super. Ct. Apr. 2, 2008)).

[169] APA Ex. A, at Definition—Losses.

SPN stickwater percentages.[170]  Simply put, the calculation is based on actual losses, not a mere multiple of the purchase price.

Second, API claims that any damages owed to Tyson either do not exceed the deductible or are limited by the escrow cap.[171]  The escrow deductible is $4.125 million and the cap is $55 million.[172]  Since API is not entitled to damages, there is no need to offset any damages awarded to Tyson.  The $4.125 million deductible has easily been exceeded.  The application of the damages cap will be addressed below.

### 2.  Mitigation wasn't necessary or even, as a practical matter, possible.

API claims that any damages should be reduced because Tyson failed to take any mitigating efforts.[173]  But, based on the breaches, the Court fails to see what mitigation efforts were even available to Tyson.  The damages at issue here were the misrepresentations by API and its acts prior to Tyson acquiring the facilities.  As such, damages are solely based on the actual value of the business/plant at the time of the sale.  Since Tyson had no control over the facilities and they had no clue to disbelieve API's representation, there was nothing Tyson could do to mitigate damages.  Accordingly, mitigation is not appropriate.

---

[170] *See* CX–18.

[171] API Reply Br. at 36–38.

[172] APA §§ 10.3(a), (c).

[173] API Opening Br. at 40.

### 3. Tyson's damages are $55 million without interest.

In Delaware, damages for fraudulent inducement and breach of contract are based on benefit-of-the-bargain calculations.[174] This means that Tyson's damages are "the difference between the actual and the represented values of the object of the [fraudulent] transaction."[175] It is intended to "put the plaintiff in the same financial position that [the plaintiff] would have been in if the defendant's representations had been true."[176]

Tyson paid $865.8 million for API's facilities,[177] but it overpaid because of API's false representations. Tyson's evaluation of the plant without notice of the misrepresentations and SPN stickwater removal project stated that facilities were worth $871 million.[178] But after considering the misrepresentations, Tyson has estimated that it overpaid by $80.1-$91.8 million.[179]

Looking at API's profits from 2015 to 2017, Tyson's expert calculated the

---

[174] *Maverick Therapeutics*, 2021 WL 1592473, at *9.

[175] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983).

[176] *Id.*

[177] *See* 11/20/24 Trial Tr. at 251 ("Q: By the way, you sold the assets to Tyson for $865 million, didn't you? A: I think it was 825. And saying 865 is like saying you took your bank account and you sold it to Tyson. That was working capital. All that was adjustments. The price was 825.").

The Court will base its calculations on estimates without synergies because you don't pay for synergies. *See, e.g.*, 11/27/19 Trial Tr. at 112 ("It's contingent upon the buyer to actually earn those synergies out of their operation. It's not coming from the operation they buy.") (D.I. 683).

[178] CX–18; 11/25/24 Trial Tr. at 14.

[179] CX–18.

amount that Tyson overpaid for API.[180] This calculation relied in part on estimating the percentage of SPN stickwater used at each plant to calculate the difference in profits for the years it used SPN stickwater.[181] Generally, the Court found that Tyson's methods for determining the percentage of SPN stickwater used at the Cummings plant were reliable.[182] In fact, Tyson's samples coincided with those API's own expert used.[183] For the Cummings plant, the SPN stickwater percentage was 4.72%.[184]

But the samples from and testimony regarding the Hanceville plant weren't as reliable.[185] The Hanceville plant has no historical records.[186] Tyson relied on only 4 samples and those samples were collected post-sale once Tyson took possession.[187] Tyson claims that the SPN stickwater percentage was 11.51%.[188] But without data from the relevant time period, it is difficult to believe that the Hanceville plant's

---

[180] CX–18; 11/25/24 Trial Tr. at 12–27.

[181] *See* 11/27/24 Trial Tr. at 10–14, 85–87.

[182] *See Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *26 (Del. Ch. Aug. 18, 2016), *judgment entered*, (Del. Ch. 2016) ("Delaware does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates of damages that lack mathematical certainty are permissible so long as the court has a basis to make such a responsible estimate.") (quoting *Beard Research*, 8 A.3d at 613).

[183] 11/27/24 Trial Tr. at 86–87 (stating that API used 30 samples and Tyson used 540 samples).

[184] *Id.* at 87–88.

[185] *See id.* at 88.

[186] *See id.*

[187] *Id.*

[188] 11/27/24 Trial Tr. at 10–11.

SPN stickwater percentage was more than double the percentage at the Cummings plant. While the Court accounts for API's own record-keeping gaps, it does not have extant evidence sufficiently reliable to support Tyson's higher damages scenario. In turn, the Court uses Tyson's lower damages estimates as an appropriate starting point.[189]

Accounting for the SPN stickwater factor, a reliably accurate valuation of API at the time of sale could be as low as $785.7 million, compared to the original estimate of $871 million. As such, a truer valuation of API might be found to be approximately $80 million lower than the purchase price.[190] And discounting any other relevant factors, it would be possible for the Court to deliver an award of up to $80 million to Tyson were the Court to find that full delta to have been proven by a preponderance of the evidence.

But, the Court finds that the higher estimate of such damages—whether the result of fraudulent inducement or breach of contract, which in this instance are truly inseparable—would be excessive and trigger the indemnification cap of $55 million.[191] As such, the proper award to Tyson is $55 million without accounting for

---

[189] *See Great Hill Equity*, 2020 WL 948513, at *20 ("[S]o long as a plaintiff provides a reasonable method to calculate damages, the risk that such cannot be determined with mathematical certitude falls on the wrongdoer, not the wronged.").

[190] CX–18.

[191] APA § 10.3(c).

interest.

### 4. Punitive damages aren't warranted.

In Delaware, the granting of punitive damages is done sparingly.[192] Typically, punitive damages aren't awarded in breach-of-contract cases.[193] But, there is an exception when the defendant "exhibits a wanton or willful disregard for the rights of [the] plaintiff."[194] This requires that the plaintiff "show[s] that the defendant acted maliciously and without probable cause for the purpose of injuring the other party by depriving him of the benefits of the contract."[195]

In this case, the Court finds the evidence of such lacking here. So, particularly in light of the substantial damages just found and to be awarded, punitive damages are not justified. Make no mistake, API's actions were wrongful. But the Court does not find the required maliciousness. Accordingly, Tyson is not entitled to punitive damages.

---

[192] Contrary to API's assertion, there is nothing in the APA that bars punitive damages. The only mention of punitive damages is in Article 10.3 where it states that Losses exclude "punitive and exemplary damages and amounts calculated as any multiple of the applicable Losses solely based on any multiple used by Buyer to determine the Purchase Price (but not excluding any other damages recoverable under Applicable Law)." APA § 10.3. The Court does not read this agreement language as a ban on punitive damages.

[193] *Callahan v. iLight Techs., LLC*, 2022 WL 2902810, at *5 (Del. Super. Ct. July 21, 2022).

[194] *Ripsom v. Beaver Blacktop, Inc.*, 1988 WL 32071, at *16 (Del. Super. Apr. 6, 1988) (citing *Cloroben Chem. Corp v. Comegys*, 464 A.2d 887 (Del. Super. 1983)).

[195] *Id.* at *18.

- 46 -

## 5.  Interest must be added to the damage calculation.

Tyson is entitled to pre-and-post judgment interest.[196]  For pre-judgment interest, the rate will be based on the "legal rate" of interest described in 6 *Del. C.* § 2301, since there is no specific interest rate within the APA.[197]

---

[196] *See Smart Sand, Inc. v. US Well Servs. LLC*, 2021 WL 2400780, at *14 (Del. Super. Ct. June 1, 2021) (explaining that pre-judgment interest is a matter of right for the non-breaching party in Delaware) (citation omitted); *see also Beard Research*, 8 A.3d at 620–21 ("Delaware courts also routinely grant post-judgment interest.") (citation omitted).

[197] *See Rollins Envtl. Servs., Inc. v. WSMW Indus., Inc.*, 426 A.2d 1363, 1367 (Del. Super. Ct. 1980).

Originally, the Court indicated pre-judgment interest would be compounded quarterly. *River Valley Ingredients, LLC*, 2025 WL 1826656, at *1. But after it was raised in API's motion for re-argument, the Court held argument on the issue because neither party sufficiently developed any interest arguments in their post-trial briefs. *See, e.g.*, D.I. 677, 678 and 682. Upon reconsideration, the Court finds that compounding interest isn't justified in this situation.

The Supreme Court hasn't clearly decided if this Court can award compounding interest. *See NGL Energy Partners LP v. LCT Cap., LLC*, 319 A.3d 335, 342 (Del. 2024). And the Court need not resolve its *power* to do so here.  For both sides have agreed:  any Delaware court that does exercise authority to grant compounding interest, must look at:  (1) the parties' sophistication; (2) the nature of any breaches; (3) the economic realities of the market; (4) the economic realities of the parties; and, (5) the fairness of compounding. *See Brandin v. Gottlieb*, 2000 WL 1005954, at *29 (Del. Ch. July 13, 2000); *see also Energy Transfer, LP v. Williams Companies, Inc.*, 2023 WL 6561767, at *22 (Del. Oct. 10, 2023); *see also Williams Companies, Inc. v. Energy Transfer LP*, 2022 WL 3650176, at *6 (Del. Ch. Aug. 25, 2022); *see also Brown v. Ct. Square Cap. Mgmt., L.P.*, 2024 WL 1655418, at *2 (Del. Ch. Apr. 17, 2024).  And now, having heard from the parties and squarely engaging those factors—as the Court should have in the first instance were it properly considering a grant of compounding—the record here doesn't support compounding interest.

While the Court could readily deem these parties "sophisticated" and note that today's market tends to compound interest, there has been no real evidence presented supporting the granting of compound interest. *See, e.g.*, 11/22/24 Trial Tr. at 263–64 (simply providing figures for damages with both simple and compounding interest) (D.I. 685); 11/25/24 Trial Tr. at 26–67 (same) (D.I. 685).  There was no testimony regarding "the probability that [API] earned more than the legal rate of interest on the moneys [it] owes to [Tyson]." *See Brandin*, 2000 WL 1005954, at *29.  Even upon the motion for reargument, Tyson made no claim that awarding simple interest would deprive it of any benefit that it's entitled to.  Without a more-developed record on this issue, it's not in the interest of justice to compound interest.  Indeed, the Court believes that the fairness factor in these unique circumstance—where, among other considerations, the Court expressly rejected a prayer for punitive damages—weighs heavily in favor of a simple interest award.

- 47 -

Tyson's right to post-judgment interest begins to accrue upon the date of the entry of this judgment.[198] The post-judgment interest shall be awarded "at the legal rate on the combined amount of the damages award and prejudgment interest."[199]

## V. VERDICT AND JUDGMENT

Tyson was determined to enter the poultry rendering market in the Southeast. After approaching API about acquiring its plants and being rebuffed, Tyson contracted with API's suppliers in preparation of Tyson building its own plant(s) or buying plant(s) from a competitor. With this change in circumstance, API reluctantly came to the negotiating table. At that point, API could use hard bargaining to extract "stupid money" for this very specialized business; it was not allowed to use deception.

In 2018, Tyson purchased API's Cummings and Hanceville plants for a total price of $865.8 million. Tyson brought suit alleging fraudulent misrepresentation and breach of contract for misrepresentations in the APA. In response, API filed multiple counterclaims.

Following an eight-day trial, the Court finds in favor of Tyson on its fraudulent inducement claim and certain aspects of its breach-of-contract claim

---

[198] *Wilm. Country Club v. Cowee*, 747 A.2d 1087, 1097 (Del. 2000).

[199] *See NGL Energy Partners*, 319 A.3d at 345 ("On the date of the judgment, the judgment debtor's obligation is a sum certain that includes the amount of the award plus prejudgment interest and, in some cases, fees and costs.").

- 48 -

centered on API's past practices and concealment from others of its use of SPN stickwater. But the Court does not find in Tyson's favor on the specific books-and-records allegation, failure to disclose the Reid Report allegation, or its allegations that API wasn't in compliance with relevant laws and government regulations.

The Court finds that API failed to meet its burden in proving any of its counterclaims.

Accordingly, Tyson is entitled to a damages award of $55 million without including interest.

### A. ON TYSON'S CLAIMS:

- <u>Count I—Fraudulent Inducement</u>: for Tyson

- <u>Count IV—Breach of Contract</u>: for Tyson regarding API's SPN stickwater practices and concealment, but not the books-and-records, Reid Report, or non-compliance with government laws and regulations.

### B. ON API'S CLAIMS:

- <u>Count I—Fraudulent Inducement</u>: for Tyson

- <u>Count II—Rescission</u>: for Tyson

- <u>Count III—Tortious Interference</u>: for Tyson

- <u>Count IV— Unfair Competition</u>: for Tyson

- <u>Count IV— Civil Conspiracy</u>: for Tyson

- <u>Count IX— Breach of Contract</u>: for Tyson

The parties shall confer and, within 21 days, submit to the Court a proposed form of Order of Final Judgment consistent with these findings and verdicts.

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*

_____

Paul R. Wallace, Judge

Original to Prothonotary
Cc: All counsel via File & Serve